IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 24, 2009 Session

**STATE OF TENNESSEE v. JASON E. MCLEAN**

**Direct Appeal from the Criminal Court for Knox County**
**No. 88277     Mary Beth Leibowitz, Judge**

**No. E2009-00221-CCA-R3-CD - Filed October 29, 2010**

Appellant, Jason E. McLean, was charged with first degree murder after he shot and killed eighteen-year-old Sean Powell. At trial, the jury found Appellant not guilty of first degree murder but guilty of reckless homicide, a lesser-included offense. The trial court denied Appellant's request for judicial diversion and sentenced him to the four-year maximum sentence. It then suspended all but ninety days and ordered Appellant to serve eleven years and two-hundred and seventy-five days on probation. On appeal, Appellant contends the trial court erred in: (1) denying judicial diversion; (2) sentencing Appellant to the maximum sentence in the applicable range; and (3) ordering a lengthy probationary period. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Jason E. McLean.

Robert E. Cooper, Jr., Attorney General and Reporter, and Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and William Crabtree and TaKisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Background**

There is no dispute that Appellant shot the victim with a high-powered rifle from very close range while the victim sat in a car in front of Appellant's house. Nor is there much dispute about the events leading to the fatal encounter. In short, the record reveals that from

Fall 2006 until the victim's death in March 2007, Appellant's marriage to Erin McLean deteriorated; Ms. McLean, a former high school student teacher, had an affair with the victim, who was one of her students; Appellant grew increasingly distraught over the affair and the collapsing marriage; and the victim's visit to the Appellant's house resulted in his death on the evening of March 10.

The overriding issue at trial was whether Appellant intended to kill the victim. Appellant said he only intended to scare the victim into leaving and that the gun fired when Appellant jerked it away from the victim's grasp. The State argued, among other things, that the fact that Appellant kept his children away from the scene; stole the rifle well in advance; retrieved the loaded gun from the basement; cocked the rifle; and aimed it at the victim all indicated that Appellant intended to kill him. Appellant apparently persuaded the jury. It found him not guilty of first degree premeditated murder, second degree murder, and voluntary manslaughter. It found him guilty of reckless homicide.

The record in this case is extensive. But this appeal concerns only the trial court's sentencing decisions. We therefore focus our recitation of the facts on the evidence relevant to the sentencing issues before us.

Linda Lou Klag, who was Appellant's neighbor for several years, testified at trial for the State. Ms. Klag testified that she was in her house on the night in question. She heard a gunshot and saw Appellant leave the scene. Ms. Klag also testified that she liked Appellant and that he was "friendly," "a great father," and a "great person."

The State called another of Appellant's neighbors, Geneva Dyer. Ms. Dyer described Appellant as a "very good neighbor," "a good man," and "a good father." She had known Appellant for approximately nine years and had never seen him angry or raise his voice. She further testified that she had known him to always be truthful.

Michael Mayes, a Knox County Emergency Communications District 911 records specialist, testified that two 911 calls were placed from the McLean house on the night of the shooting. Appellant made the first call at 9:13:32 p.m. to report that an "intruder" was in his house "stalking" his wife. Appellant told the operator that the intruder was one of his wife's former students. Appellant then told the operator that the intruder was leaving and that he no longer needed the police. The call ended shortly thereafter.

Four minutes and fifty-two seconds later, Ms. McLean placed the second 911 call to report that Appellant had shot the victim. As explained by other witnesses, police found the victim slumped in the driver's seat of his car with a massive wound to his head that indicated he had been shot from close range. The gruesome photographs of the scene that were

-2-

admitted into evidence show portions of the victim's brain scattered throughout the car.

John Knopf, an officer with the Knoxville Police Department (KPD), testified that he found Appellant the next morning. Office Knopf was dispatched to investigate a call reporting that a man was carrying a gun and walking by a set of railroad tracks in west Knox County. When Officer Knopf arrived, he quickly located Appellant, who told Officer Knopf that he wanted to turn himself in. Officer Knopf told Appellant that he knew who Appellant was and took him into custody. Officer Knopf described Appellant as "very cooperative," "docile," and "polite" during the encounter. Although Appellant told Officer Knopf that "last night was a mistake," and disclosed where he put the gun, Officer Knopf did not engage in a substantive interrogation about the previous night's events. Police later located the gun based on Appellant's statements.

Russell Whitfield, a member of the KPD's forensic unit, helped investigate the scene. He testified that inside the McLean house he discovered a suicide note that Appellant apparently wrote to Ms. McLean.

Patricia Resig, a firearms examiner with the KPD, testified that there are only two ways Appellant could have unintentionally fired the rifle. The first would occur if the victim grabbed the rifle's barrel and the safeties were off, the round was in the chamber, the hammer was cocked, the two-piece firing pin was aligned, and Appellant's finger was on the trigger. The second scenario would occur if the gun's hammer was on the aligned firing pin and the gun was then bumped from the rear.

Todd Childress, a KPD investigator, testified that he read Appellant his Miranda rights and that Appellant waived those rights. He also testified that Appellant then told him that he used the rifle to kill the victim.

Andrew Boatman, a KPD homicide investigator, testified that he interrogated Appellant the morning after the shooting. Appellant told him that, although he remembered killing the victim, he did not recall anything else that happened after he called 911. At Detective Boatman's urging, Appellant wrote a letter of apology to the victim's family. Detective Boatman testified that he thought Appellant "never really was forthcoming" during the discussion.

The State played a video recording of Detective Boatman's interview with Appellant. During the interview, Appellant told Detective Boatman that he took the McLean children to his parents' house five to ten days earlier because of problems he and Ms. McLean were having. In particular, Appellant said that Ms. McLean had been mean to the older child and Appellant believed it would be best to remove them from the house. He also noted that he

had filed for a protective order against Ms. McLean a few days earlier because his wife was mentally and physically abusive. However, he withdrew the application before an order issued. Appellant told Detective Boatman that he borrowed the gun a couple of weeks before the shooting. He took the gun intending to use it to kill himself. With respect to the shooting, Appellant stated that he did not know what happened after he placed the 911 call. He recalled that the victim started to leave but then stopped. Appellant said he could not clearly remember what happened after that, but he left the scene and drove to West High School. During the interview, Detective Boatman pressed Appellant to acknowledge that he contemplated killing the victim prior to the shooting. Appellant consistently maintained that he never thought about it.

The State's final witness was Darinka Polchan-Mileusnic, a forensic pathologist and the Chief Medical Examiner for Knox and Anderson Counties. Dr. Polchan-Mileusnic conducted the autopsy on the victim's body. She concluded that the victim was killed by a gunshot wound to the head. The gun was fired from close range. She noted that the victim had a graze wound on his hand and that his hand had some black residue on it. She described the wound as "defensive" and explained that the residue indicated that the gun's barrel was very close to the victim's hand but not actually touching him.

Dr. Polchan-Mileusnic testified that the autopsy results did not support Appellant's statement that the victim grabbed the rifle's barrel. First, she explained that the absence of a burning or searing wound on the victim's hand indicated that he was not touching the barrel when it was fired. Second, she noted that the photographs of the victim's body indicated that his right arm came to rest between his body and the center console and that he still had a cigarette in his right hand. In Dr. Polchan-Mileusnic's opinion, neither fact indicated that the victim's arm was outstretched and reaching for the rifle just prior to the shooting.

Appellant testified in his own defense. He began by describing his background. He said that he was thirty-three years old and was born and raised in Knoxville and Lenior City. He testified that he came from a close family, with four brothers and two sisters. His parents had been together for forty years.

Appellant met Ms. McLean in March 1994, and they married two years later. They had two children together, who at the time of trial were twelve and nine years old. He noted that he last saw his children on March 9, 2007, when he dropped them off at his parents' house after school.

Appellant described the McLeans' lifestyle in the years prior to Ms. McLean's affair. Appellant worked and generally cared for the children while Ms. McLean attended school. Ms. McLean received a degree, but Appellant did not because the family moved to Indiana

for two years so Ms. McLean could pursue an advanced degree. They planned for Ms. McLean to work upon their return to Knoxville so that Appellant could pursue his own degree. However, Ms. McLean did not like her job and decided to go back to school. Appellant acquiesced.

Appellant explained that from 2005 to 2006, he lived a hectic life. He woke up around 6:00 a.m. to get the children up, dressed, and fed. He then walked them to school. Afterward, Appellant attended classes and Ms. McLean went to work. Appellant picked the children up after school and fed them. When Ms. McLean returned from work, the family typically had about an hour together before Appellant went to work. He generally returned home around midnight, completed his homework, and went to bed.

In the fall of 2006, Ms. McLean began working as a student teacher at West High School in Knoxville. Appellant recalled that she talked about the victim, whom she started tutoring that October.

Appellant testified that the McLean family attended a Quaker church during this time. He said that the family chose the church because it believed in "peace and compassion and nonviolence and all." Appellant testified that he stopped going when Ms. McLean started inviting the victim to attend with them.

In January 2007, Ms. McLean admitted to Appellant that she had been having an affair with the victim. The admission confirmed what Appellant had long suspected. Appellant explained that the marriage was falling apart during this time. Appellant said he was trying to keep the family together until Ms. McLean resolved her problems.

Appellant testified that the collapsing marriage was almost more than he could take. About a week and a half before the victim's death, Appellant stole a rifle and some ammunition from his father. Appellant loaded the gun intending to kill himself. He did not follow through with his plan, and he stored the gun in the basement of the McLean house.

Appellant testified that a week before the victim's death, Appellant and his friend went to a bar to have a drink. The victim and Ms. McLean arrived later and sat down at the same table as Appellant and his friend. Ms. McLean, who was intoxicated, flirted with the victim in front of Appellant while all four sat at the table.[1] Appellant testified that the four left the bar at the same time but not together. Appellant went to his music studio for a little

---

[1] Some of the details of this incident were supplied by Appellant's friend, Scott Murrin, who also testified for the defense. During Appellant's direct examination, Appellant agreed with Mr. Murrin's testimony about the encounter at the bar.

while before returning to his home. When he got home, he found Ms. McLean having sex with the victim in the McLeans' bed. Although the gun was still in the basement at that time, he did not retrieve it because he did not want to use it to hurt anyone other than himself.

Around that time, Appellant took the McLean children to his parents' house. He did so, he said, because Ms. McLean pushed the older son into a closet door and scratched him. According to Appellant, she was angry because the son told Appellant that Ms. McLean had taken the children to the liquor store and then a park after their bedtime so that she could meet the victim. This incident prompted Appellant to apply for a protective order against Ms. McLean. The next day he decided not to pursue it because he hoped they could resolve their problems.

Appellant testified that he had other encounters with the victim in the two days before the shooting. Appellant awoke on March 9 to find the victim's car in front of the McLean house. That night, the victim called Appellant to inform him that the victim and Ms. McLean were at a play together. Ms. McLean and the victim returned to the McLean home at around 12:15 a.m., and the victim spent the night on the McLean's couch. Appellant testified that the gun was in the basement during these encounters, but he never thought about getting it. Instead, he got up the next morning and told the victim to leave before Ms. McLean awoke.

Appellant testified that he almost decided not to go to work that day because he was afraid the victim would come back to the house. Appellant ultimately left and returned home around 6:00 p.m.

Appellant and Ms. McLean planned to go out that night, but Ms. McLean was not ready when he got home. Instead, she was taking a bath. While in the bath tub, Ms. McLean ordered Appellant to run several errands. Appellant recalled that Ms. McLean screamed at him and threatened that she would not go out with him if he did not do what she said.

Among Ms. McLean's demands was that Appellant move a load of the McLeans' possessions to another house. Appellant explained that the McLeans were renovating a portion of their house and needed to temporarily move the items. Appellant complied and went to the driveway to load the car.

The victim arrived while Appellant was loading the car. Appellant testified that he told the victim to leave, but the victim ignored him and walked into the house. Appellant followed him, still demanding that he leave. The victim refused, and Appellant called 911. While Appellant was on the telephone, the victim left the house. Appellant told the 911 operator the police were no longer needed and ended the conversation.

Afterward, Appellant looked outside and saw that the victim had not left. Appellant said Ms. McLean began yelling at Appellant for calling the police. While Ms. McLean was yelling at Appellant, the victim walked into the house. The victim and Ms. McLean then went to the backyard. Appellant remained in the house crying, and Ms. McLean and the victim sat on a swing taunting him.

The victim and Ms. McLean then got up to leave. As they walked toward the victim's car, Appellant begged Ms. McLean not to leave. Appellant testified that Ms. McLean returned to the house to get something and told Appellant that she was going to get their children.

Appellant followed her into the house, but he went to the basement to retrieve the rifle. He went out the front door and approached the victim. Appellant again told the victim to leave, and the victim laughed. Appellant testified that he then told the victim "[y]ou're not taking my kids from me; you already have [Ms. McLean]." According to Appellant, the victim responded, "I'll take that gun and shove it up your ass." Appellant cocked the gun, and the victim said, "[i]n two weeks they'll be calling me daddy." Appellant testified that the victim then grabbed and pulled the gun hard enough to "about pull[ Appellant into] the car." Appellant explained that he "jerked back," and the gun discharged. Appellant fled the scene knowing that he had shot the victim. Appellant testified that his recollection was not very clear at that point but that he remembered driving to West High School to kill himself.

On cross-examination, Appellant admitted that he wrote an email purportedly seeking advice about open marriages. Appellant explained that he wrote the email in jest, not because he had agreed to an open marriage with Ms. McLean.

Appellant also admitted that he initially told Detective Boatman that he stored the rifle in his truck, rather than the basement. Appellant testified he did not know why he said that to Detective Boatman. He likewise had no explanation for not telling Detective Boatman that the victim grabbed the barrel of the rifle.

Finally, Appellant admitted that he took several steps to prepare the gun to fire just before he shot the victim. The gun was already loaded, but the round was not yet in the chamber. Appellant cocked the gun, putting the round in the chamber, and pointed it at the victim. However, Appellant testified that he did not know if the safety was engaged.

The defense also called Brenda Lovelace, Appellant's mother's best friend. Ms. Lovelace testified that she had known Appellant his entire life and that she knew him well. At the time of trial, Ms. Lovelace employed Appellant to work on her farm. She described Appellant as "usually a quiet young man" but noted that he had a "good sense of humor."

She said he was "a very caring person" and that he was "passive" and "very gentle." She also testified that Appellant had a good reputation in the community, that she had always known him to be truthful, and that she trusted him.

At the sentencing hearing, the State produced several witnesses who testified about the victim and the devastation his death had caused. In particular, the State called the victim's biological and adoptive mothers, his brother, and his sister. They each gave emotional testimony about the impact of the victim's death. Some also expressed the difficulty they had with accepting the jury's verdict, which they considered to be unfair.

Appellant apologized to the victim's family and expressed remorse for the victim's death. He also reiterated his claim that he never intended to hurt the victim.

Appellant requested judicial diversion and, failing that, probation. He argued that he acted under strong provocation in unusual circumstances that demonstrated he lacked a sustained intent to violate the law. Appellant asserted that the circumstances of the offense; his personal circumstances, such as his work ethic and parenting skills and responsibilities; and his performance during the eighteen months he was free after his arrest indicated that he could be rehabilitated and was a low risk for recidivism.

The trial court first denied Appellant's request for diversion. The trial court's sole basis for denying diversion was that it would depreciate the seriousness of the offense.

The trial court then analyzed the applicable enhancing and mitigating factors, as well as the principles of sentencing, in arriving at a four-year sentence. It found that enhancement factor (9), Tenn. Code Ann. § 40-35-114(9), applied because Appellant used a firearm to commit the offense. The trial court gave this factor "great weight" because the weapon was not an "ordinary firearm," but a high-powered rifle. The trial court noted the gruesome nature of the photographs of the victim showing that "this young man's brains were blown out of his head." The trial court also considered the fact that the victim was unarmed.

The trial court also applied three mitigating factors but minimized the weight it gave them. First, the court noted that the evidence indicated that Appellant acted under a strong provocation. See id. 40-35-113(2). However, it concluded that the jury had "already . . . taken [that factor] into consideration as part of [its] verdict. . . . So [the court did] not consider that factor very strongly." Second, the court applied mitigating factor (11), that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." Id. at (11). The court stated that although it was "probably true" that the circumstances did not suggest a sustained intent to violate the law, the court discounted that

factor because Appellant fled the scene rather than attempt to aid the victim. Consequently, the court applied the factor but gave it "very little" weight. Finally, it gave "some consideration" to the fact that Appellant had shown remorse. See id. at (13).

The trial court listed the other factors it considered in evaluating the appropriate sentence. It noted that (1) Appellant had no prior criminal history; (2) another court had found Appellant to be a good parent; (3) the evidence indicated that, prior to this offense, Appellant had "previous good character"; and (4) Appellant was likely to abide by any terms of probation set by the court. At the same time, however, the court expressed "concern[] about the thought, or lack thereof, that [Appellant] put into [his] act," which the court explained was "driven by [Appellant's] emotions."

Next, the trial court considered Appellant's request for full probation and concluded that Appellant had not met his burden to demonstrate that full probation was appropriate. It sentenced Appellant to the maximum length within the applicable range, four years, "[i]n order to avoid the depreciation of the seriousness of this offense." However, the court concluded that split confinement was appropriate and ordered Appellant to serve ninety days in confinement before being placed on probation. Appellant was given credit for pretrial jail time, leaving a balance of forty-seven days to serve.

At the conclusion of the trial court's ruling, the State asked the court to increase the probationary period to the statutory maximum of twelve years. The defense objected. The court initially stated that it would keep the four-year probation because it believed it could increase Appellant's probation later if necessary. Additionally, the court stated that it was not aware that it could extend the probation period. The State then asserted that, after the initial sentencing, the court could not increase Appellant's probation without revoking his probation entirely and therefore the court should order a longer term.

Upon the conclusion of argument, the trial court concluded that Appellant's probationary period should be eleven years and two-hundred seventy-five days. It cited five reasons for the new conclusion: (1) "[t]o avoid depreciating the seriousness of the offense;" (2) "[t]o avoid having the community's belief that others might commit similar offenses would be tolerated;" (3) "[t]hat it be an effective deterrent;" (4) "that this is a homicide and that factor alone is an issue that weighs heavily upon the court;" and (5) that Appellant used a high-powered firearm in committing the offense.

Appellant now appeals each of these sentencing decisions.

## II. Analysis

-9-

## A.  Diversion

We begin with Appellant's claim that the trial court erred in denying diversion. Judicial diversion is a statutory mechanism by which a defendant that has been found guilty may expunge all reference to his "arrest, indictment or information, trial, finding of guilty, and dismissal and discharge" from his "official records." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999) (quotation marks omitted).  Tennessee Code Annotated section 40-35-313 provides the statutory framework for the process.  However, "[j]udicial diversion is not an alternative sentence enumerated under [section] 40-35-104," and there is no presumption of favorable candidacy. State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by, State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000).

Because diversion is not an alternative sentence under section 40-35-104, diversion decisions are reviewed for abuse of discretion. See State v. Turco, 108 S.W.3d 244, 246 n.5 (Tenn. 2003); see also State v. Robinson, 139 S.W.3d 661, 665 (Tenn. Crim. App. 2004). "To find an abuse of discretion, we must determine that no substantial evidence exists to support the ruling of the trial court." State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). "[W]e may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision." State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); see also Robinson, 139 S.W.3d at 665.

Nevertheless, trial courts must adhere to a particular analytical framework.  The framework focuses on the "defendant's amenability for correction." State v. McKim, 215 S.W.3d 781, 786 (Tenn. 2007) (emphasis and quotation marks omitted).[2] "Any factors tending to reflect accurately upon whether the . . . defendant will or will not become a repeat offender should be considered." 215 S.W.3d at 786.  But the criteria must include "[1] the defendant's amenability to correction; [2] the circumstances of the offense; [3] the defendant's criminal record; [4] the defendant's social history; [5] the defendant's physical and mental health; and [6] the deterrence value to the defendant and others." Robinson, 139 S.W.3d at 665; see also McKim, 215 S.W.2d at 786-87.  Additionally, the court can consider whether diversion "will serve the ends of justice, i.e., the interests of the public as well as the defendant." Robinson, 139 S.W.3d at 665.  While the trial court can also consider the circumstances of the offense and the need for deterrence, those factors "cannot be given controlling weight unless they are of such overwhelming significance that they necessarily outweigh all other factors." McKim, 215 S.W.3d at 786-87 (emphasis, quotation marks, and brackets omitted).  In other words, because "[t]he facts and circumstances of nearly all

---

[2] McKim concerns pretrial diversion decisions, which are made by the district attorney general. 215 S.W.3d at 786.  The same analysis applies to trial courts considering judicial diversion. See Cutshaw, 967 S.W.2d at 344.

criminal offenses are by definition serious," "the circumstances of the offense and the need for deterrence may alone justify a denial of diversion . . . only if all of the relevant factors have been considered as well." State v. Curry, 988 S.W.2d 153, 158 (Tenn. 1999) (emphasis omitted).

Despite our deferential standard of review, these factors are not merely a list of suggested considerations. Rather, "the record must reflect that the court has weighed all of the factors in reaching its determination." Electroplating, 990 S.W.2d at 229. In other words, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id.; see also Cutshaw, 967 S.W.2d at 344 ("[A] trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration.").

The trial court did not expressly couch its diversion decision in terms of the framework described above. Nor did it expressly weigh all of the relevant considerations in the context of its diversion analysis. Nevertheless, the record clearly reflects that the trial court gave due consideration to all of the appropriate factors. As discussed below, it conducted a thorough evaluation of the propriety of probation in this case. "The same guidelines are applicable in diversion cases as are applicable in probation cases," they are just "more stringently applied to those seeking diversion." Bingham, 910 S.W.2d at 456. Consequently, because we conclude that the trial court properly denied full probation, it did not abuse its discretion in denying diversion. See id. at 456-57.

### B. Length of Sentence and Probation

We next turn to Appellant's claims that the trial court erred in sentencing him to the statutory maximum and in setting the length of probation. Unlike diversion, appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing

Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. 40-35-401(d); Ashby, 823 S.W.2d at 169.

## 1. Length of sentence

We discern no reversible error in either the length of Appellant's sentence or the duration of his probation. We begin with his sentence. The trial court correctly applied enhancement factor (9) because Appellant used a firearm to commit the offense. See State v. Ricky Williams, No. E1999-00344-CCA-R3-CD, 2000 WL 772748, at *3 (Tenn. Crim. App. at Knoxville, June 15, 2000) (enhancement factor (9) may be applied in a reckless homicide case because the use of a firearm is not an essential element of the crime). Furthermore, as was its prerogative, the trial court gave that factor great weight because the weapon was a high-powered rifle. The trial court also emphasized the fact that Appellant used such a dangerous weapon against an unarmed victim. Appellant contends that the trial court's reliance on the fact that the victim was unarmed amounted to sua sponte consideration of an inappropriate enhancement factor. We disagree. We read the trial court's statements to indicate that the court gave a proper factor—the use of a firearm—greater weight because of the manner in which Appellant used that weapon, i.e., against an unarmed victim. The record supports the trial court's weighing of enhancement factor (9).

The trial court also correctly applied three separate mitigating factors and credited those factors with the weight it deemed appropriate. First, while the court noted that the evidence suggested Appellant acted under strong provocation, see id. § 40-35-113(2), the trial court discounted that factor. It concluded that the jury took that facet of the case into consideration in arriving at the verdict that Appellant was guilty of reckless homicide but not any of the greater offenses. That is a valid basis for apportioning weight to a sentencing factor. Second, the court found that the evidence suggested that Appellant probably did not act with a sustained intent to violate the law and applied mitigating factor (11). Yet it tempered that conclusion by noting that Appellant fled the scene rather than try to assist the victim. This is also a fair basis for weighing a sentencing factor. Finally, the court also applied mitigating factor (13) by finding that Appellant had demonstrated remorse.

The trial court also considered Appellant's clean criminal history; the fact that another court had found that Appellant was a good parent; and the ample testimony concerning Appellant's good character prior to the offense. It concluded that Appellant had a strong likelihood of rehabilitation and a low likelihood of recidivism. It also concluded that it was highly probable that Appellant would abide by the terms of probation. However, the court

also expressed concern that Appellant was driven by his emotions to commit this crime, and the court gave great weight to the lack of thought Appellant put into his conduct.

After noting these additional items, the trial court set Appellant's sentence at the four-year statutory maximum and ordered split confinement. In justifying the maximum sentence, the trial court concluded that anything less would depreciate the seriousness of the offense.

We conclude that the trial court did not err in arriving at the four-year sentence. The trial court's careful detailing of its analysis on the record demonstrates that it gave thorough consideration to the full panoply of sentencing considerations. The trial court's conclusion that split confinement was appropriate further indicates that the trial court properly balanced the facts counseling in favor of a harsher punishment with those counseling a less severe one.

## 2. Length of probation

We similarly conclude that the trial court did not err in ordering Appellant to serve twelve years on probation. We begin by noting that once a sentencing court determines that probation is appropriate, it may set any length of probation from the statutory minimum "up to and including the statutory maximum time for the class of the conviction offense." Tenn. Code Ann. § 40-35-303(c)(1). In addition, the Sentencing Commission Comments instruct that the length of probation need not be the same as the length of the sentence. See id. § 40-35-303, Sentencing Commission Comments. However, as the State correctly advised the trial court, once sentencing is complete, the trial court cannot extend the length of probation without revoking Appellant's probation entirely. See id. § 40-35-308(b). In this case, the statutory maximum sentence for this Class D felony is twelve years. See id. § 40-35-111(b)(4). The question is, therefore, whether the trial court erred in ordering Appellant to serve the statutory maximum twelve years on probation.

We have long and consistently held that sentencing courts are entitled to wide latitude in setting the length of probation. See, e.g., State v. Benjamin Monroe, No. M2007-02196-CCA-R3-CD, 2009 WL 47332, at *6 (Tenn. Crim. App. at Nashville, Jan. 7, 2009); State v. Joseph Ray Evans, No. M2006-02748-R3-CD, 2008 WL 110089, at *3 (Tenn. Crim. App. at Nashville, Jan. 9, 2008); State v. Brian Necessary, No. 02C01-9307-CR-00131, 1994 WL 413482, at *3 (Tenn. Crim. App. Aug. 10, 1994). The Sentencing Commission Comments explain that such latitude "encourage[s] the use of probation as a sentencing alternative." Tenn. Code Ann. § 40-35-303, Sentencing Commission Comments. Furthermore, a trial court need not rely upon an enhancement factor in setting a lengthy probation. See Necessary, No. 02C01-9307-CR-00131, 1994 WL 413482, at *3.

Here, the trial court gave five reasons for its lengthy probation. First, it sought to

-13-

avoid depreciating the seriousness of the offense. Second, a shorter period would perpetuate a belief in the community that such offenses would be tolerated. Third, it concluded that the longer term would serve as an effective deterrent. Fourth, it noted that "this is a homicide and that factor alone is an issue that weighs heavily upon the Court." Finally, the court relied upon the fact that Appellant committed the offense with a high-powered rifle.

These justifications allow the trial court to invoke its wide discretion to impose a long probation. Throughout its sentencing analysis, the trial court was concerned about depreciating a very serious offense. That is a valid concern, and it is one that underlies each of the court's stated justifications.

Appellant contends that extended probationary periods are available only to alleviate a trial court's reluctance to invoke alternative sentencing in a close case. Appellant argues that the trial court had already imposed the sentence, including four years of probation, and was satisfied with the four-year split confinement sentence. Therefore, the longer probationary period was not appropriate.

As factual matter, the trial court began with a four-year probationary period because it was under the erroneous belief that it could extend the period at a later date if necessary. As the State correctly pointed out, the court could not extend the probationary period, at least not without revoking probation entirely. The option to extend the probationary period, therefore, appears to have comforted the court in ordering probation. Furthermore, this court has concluded that the trial court's wide latitude in setting the length of probation is not just to encourage alternative sentencing. It also gives trial courts the flexibility to impose a punishment specifically tailored to the needs to the particular case. See, e.g., Monroe, No. M2007-02196-CCA-R3-CD, 2009 WL 47332, at *6. In this case, the trial court concluded that the combination of a "relatively light incarceration" and "an extended probationary period" was the least severe sentence necessary to achieve the goals of sentencing. Id. Our review gives us no reason to second-guess the trial court's decision that an extended probationary period is proper.

### III. Conclusion

After a thorough review, for the foregoing reasons we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-14-